## GEORGE K. McGAW

### vs.

## FRANK J. HOEN.

*Corporations: issue of stock for property; Section 61 of Article
23 of Code of 1888; no power in directors without author-
ity of stockholders; fact that all directors are stock-
holders, not sufficient. Certificate of indebted-
ness to stockholders for land for which
they had been paid in
stock, void.*

Under Section 61 of Article 23 of the Code of 1888, stock
could be issued for property for a corporation only when it had
been previously authorized by the stockholders at a general meet-
ing specially called for that purpose.                    p. 677

Without such authorization, the directors had no power to
take such action.                                         p. 677

The fact that the directors and stockholders were the same
parties does not make legal such action by the directors merely,
unless it had been so authorized by them as stockholders.

                                                    pp. 679, 680

Issuing by the directors of certificates of indebtedness to be
paid to certain stockholders for land purchased by them for the
corporation, when the same had already been paid for to them
in stock, is *ultra vires* and invalid.                  p. 679

Equity has authority to order the cancellation of certificates
of indebtednes of a corporation that were improperly issued.

                                                         p. 682

*Decided February 11th, 1919.*

Appeal from the Circuit Court No. 2 of Baltimore City.
(AMBLER, J.)

The facts are stated in the opinion of the Court and in the
case of *Conowingo Land Company* v. *McGaw,* 124 Md. 643.

The cause was argued before Boyd, C. J., Briscoe, Burke, Thomas, Urner and Constable, JJ.

*W. Irvine Cross* (with whom was *W. T. Warburton* on the brief), for the appellant.

*Thomas H. Robinson,* for the appellee.

Boyd, C. J., delivered the opinion of the Court.

In the case of *Conowingo Land Company* v. *McGaw*, 124 Md. 643, we reversed the judgment and awarded a new trial. When that case was about to be reached for retrial the appellee filed a bill in equity against McGaw and the Conowingo Land Company in which he alleged that he was the owner of 400 shares of the capital stock of that company and prayed, amongst other things, that McGaw be required to deliver up the evidences of debt claimed by him which were involved in the case in 124 Maryland; that they be declared to have been invalidly, illegally and fraudulently issued and void; that said McGaw be enjoined from asserting any right or claim to the said evidences of debt and to the sums of money mentioned therein, and from prosecuting his said claim against the Conowingo Company. It was further prayed that the Conowingo Company be enjoined from paying said evidences of debt or any sum or sums of money thereunder, and there was a prayer for general relief. A preliminary injunction was issued, separate answers of the defendants filed and testimony taken. A decree was passed making the injunction permanent and enjoining McGaw from further prosecution of the action referred to or from instituting any other action or proceeding on the "due bills" or "certificates of indebtedness" mentioned. It further ordered McGaw to cancel said due bills, or cause them to be cancelled, and to pay the costs. From that decree this appeal was taken.

The most important questions for our decision are: (*a*) Were the certificates of indebtedness legally and validly issued

by the Conowingo Company; and (b) if they were not, was the plaintiff entitled to relief in a court of equity? Other questions were argued, but those are the most material ones.

(a) The form of the certificate is set out in full in 124 Maryland, and we will not copy it in this opinion. Mr. McGaw had two certificates for $5,000 each and one for $3,150. Certificates were issued to James H. Harlow for the same amounts. What we said in the opinion in 124 Md. is sufficient to show that we were of opinion that there was nothing in the form of the certificates which would necessarily affect their validity, but it is strange that the president of the company was not called upon to sign them, as the treasurer who did sign them was an interested party. But inasmuch as the directors had unanimously authorized them to be issued, at a meeting over which the president presided, it may be that they were executed in the form they were for convenience, and not for the purpose of withholding from him knowledge that they were issued. After a careful examination of the evidence and the law applicable thereto, we are of opinion that there was no consideration for them, and that the directors had no power to pay Messrs. McGaw and Harlow the amounts they represented. Mr. Caldwell held the title to what was spoken of as the Bell property. He purchased it for $50,000, $25,000 of which were paid in cash and the remainder secured by mortgage. Mr. McGaw and Mr. Harlow each contributed $13,150, which was used in making the cash payment and some other payments in connection with the purchase. They had an arrangement with him by which he was to have an interest in the profits or the proceeds of sale to be made by him and, without now referring to the evidence of Messrs. Harlow and Caldwell on that subject, we will quote from that of Mr. McGaw which in part was as follows: "5Q. What was the purpose of the incorporation of the Conowingo Land Company? A. The purpose was to define the three interests to Mr. Harlow, Mr. Caldwell and myself. We had agreed to give Mr. Caldwell one-third of the profits above the cost of the property, and

the corporation was formed and the stock issued in order that he might definitely confine his interests above the cost of the property * * * 6Q. It has been suggested that the stock issued represented the total value of the land free from the debt to you and Harlow. Please state what the fact was about that? (Mr. Robinson): I object. (The Witness): It did not. It was done more especially to define and to give Mr. Caldwell his interest above the cost that we had promised him for his various services."

The Conowingo Land Company was organized to take over that property. It had an authorized capital stock of $60,000, divided into 600 shares of $100 each. After it was organized nine shares of stock were subscribed—three by Mr. McGaw, three by Mr. Harlow and three by Mr. Caldwell. A share was given by Mr. Harlow to his brother, George R. Harlow, and one by Mr. Caldwell to his brother, S. J. Caldwell, for the purposes of the organization. Those five were named as directors. On April 17, 1902, Charles C. Caldwell submitted to the stockholders of the Conowingo Land Company the following proposition:

"I, Charles C. Caldwell, hereby submit a proposition to subscribe for 591 shares of the capital stock of the par value of $100 each of the Conowingo Land Company of Cecil County, and in payment therefor, it is proposed to sell, transfer and convey to said company all my right, title, interest and claim of, in and to the tracts of land located on the east bank of the Susquehanna River in the 8th District of Cecil County, as conveyed to me by deed from Philip T. Bell and others representing the estate of James C. Bell, deceased, by their deed dated the 10th day of July, 1900, and duly recorded in the Land Records of Cecil County and upon the delivery of a deed by me to your company for said property, your company is to assume and pay the purchase money mortgage of $25,000 made and given by me in part payment for said land and property to the estate of the said James C. Bell,

deceased, and is also to issue and deliver to me the said 591 shares of the capital stock of your company of the par value of $100 each, all of which is respectfully submitted.

"(Signed)   Charles C. Caldwell."

That was accepted by the stockholders, and later on the same day Charles C. Caldwell, George K. McGaw, S. J. Caldwell and James H. Harlow, who were four of the five directors, met and organized by electing Charles C. Caldwell president, James H. Harlow secretary, and George K. McGaw treasurer. At that meeting the secretary read the resolutions of the stockholders passed relative to the purhase by the company from Charles C. Caldwell of the property recently acquired by him from the estate of James C. Bell and the subscription thereby made by him to the capital stock of the company. It was resolved that the proper officers of the company be directed to carry out the instructions as provided for in the resolutions adopted at the meeting of the stockholders, and, after providing for the procuring of a corporate seal, stock certificates and necessary books and stationery, the minutes of the meeting concluded as follows:

"On motion, it was unanimously resolved that the officers be, and they are hereby authorized and directed to issue due bills of this company for cash advances with interest, namely: A due bill to George K. McGaw for $13,150.00, and a due bill to James H. Harlow for a like amount of $13,150.00, and that said due bills shall bear interest from the first day of April, 1902, at the rate of 6% per annum until paid by the company, the same having been part of the purchase money paid the said Bells for the real estate."

A certificate of stock was issued to Caldwell for 591 shares, which was returned and three certificates for 197 shares each were issued to Messrs. McGaw, Harlow and Caldwell, which, together with the shares already held or controlled by each of them, made 200 shares for each—thus including the whole of the capital stock of the company. Sections 61 and 62 of

Article 23 of the Code of 1888 were still in force when the subscription of Caldwell was made and accepted for the 591 shares, as they continued to be for some years afterwards. The transactions were therefore governed by them and other provisions of the statute then applicable to subscriptions of the capital stock of corporations payable in land or other property.

By Section 61 subscriptions to capital stock of a corporation were authorized to be made in land or other property at a valuation to be agreed upon between the corporation and the subscriber, when the property was such as it was proper that the corporation should own, but not unless previously authorized by the stockholders, assembled in general meeting pursuant to a call to consider the propriety of receiving the subscription and of fixing the terms. By Section 62, when property of any kind was so received in payment of stock, it was provided that "the books of the company shall be so kept as to show at all times fully what property was received for the said stock, at what value and the number of shares of the capital stock issued for the same; in all other cases money only shall be considered as payment of a subscription to any part of the capital stock." Then by Section 65 the president and a majority of the trustees, directors or managers of such corporation were required to make a certificate, within thirty days after the payment of the last instalment of stock limited in the certificate of incorporation, stating the amount of the capital stock so fixed and paid in, and of all property received in payment for any of said subscriptions, and the extent to which said payments have been made in property, which certificates were required to be sworn to by the president and filed with the clerk of the court in which the certificate of incorporation was recorded.

It is therefore clear that the stockholders, and not the directors, were required to act in such matters. There is no suggestion in the proposition submitted by Caldwell and accepted by the stockholders of a proposed payment by the company of any sum of money, except the $25,000 secured

by the mortgage, subject to which the land was conveyed.
The 591 shares of the capital stock were to be in full pay-
ment of the property, subject to the mortgage.    That was
required to be made a matter of record on the books of the
company, so as to show what the corporation received and
what it gave in the transaction.    In this case it gave $59,100
in the par value of stock for property which was subject to a
$25,000 mortgage, but was not subject to the mortgage plus
$26,300 of indebtedness.    The directors had no power to add
such a burden on the company in that transaction.    It would
have opened the door to the grossest fraud, if that had been
permitted by the statute.    Anyone desiring to buy stock of a
company which had issued any of its stock for property
would, under the statute, look to the minutes of the proceed-
ings of the stockholders, and not to those of the directors, to
ascertain what was done.    The property was paid for by the
stock, but if the theory of the appellant be correct, then any
person who subscribed for stock to be paid for in property
could not only have gotten stock, represented to be fully paid,
but he could have been repaid all that the property had cost
him.    In short, he would have gotten his money back in cash,
and then got the stock for nothing, if the property was not
worth more than it had cost him.    The law as found in those
sections has been very materially changed, but it never con-
templated such results as those we have suggested.

Mr. McGaw said that the plan was adopted so that Cald-
well would get what he was entitled to—one-third of the
profits out of the land.    That was a matter between Caldwell
of the one part and McGaw and Harlow of the other part,
and not between the company and them.    If the understand-
ing was that they were first to be paid what they had paid out
on the property, it could easily have been arranged.    It could
have been provided in the subscription that the company was
to pay the amount or give a mortgage for it in addition to
the stock, or they could have agreed with Caldwell that
$26,300 worth of stock, or such amount as would have been
proper and fair, should be first given to them, and the bal-

ance divided into three parts. According to the terms of the
subscription, the property was to cost the company $59,100
plus the $25,000 mortgage, and that is what parties dealing
with the company or in its stock had the right to believe it
did cost, but according to the appellant it cost $26,300 more.
Such a transaction would be directly contrary to the letter
and spirit of the statute.

It was suggested that the stockholders and the directors
were the same parties, and hence it could make no real differ-
ence, but as we have shown when they acted in one capacity,
as stockholders, they were authorized to do what they could
not do when acting in the other, as directors, and the same
protection is not afforded the public in the one case as in the
other. Moreover, the stock was liable to be sold, as it subse-
quently was sold, but there was nothing in the books of the
company to suggest that there was such an indebtedness as
this, excepting the resolution of the directors authorizing
the giving of "due bills" and some later action by them pro-
viding for giving a second mortgage. We feel constrained,
therefore, to answer the first question in the negative, and to
hold that the certificates of indebtedness were not legally
issued and the directors' action was *ultra vires.*

(*b*) While the 400 shares of stock of the Conowingo Land
Company stand in the name of Mr. Hoen, the appellee, he
was representing the general mortgage bondholders of the
Susquehanna Power Company. He became the purchaser on
the 21st of February, 1913, from trustees appointed by a
decree of the Circuit Court for Harford County to sell the
properties, rights, etc., of that company, which had acquired
the 400 shares of stock formerly held by Messrs. McGaw and
Harlow through several transfers. Messrs. McGaw and Har-
low had sold those shares in 1905 to the Susquehanna Con-
tracting Company. They and M. H. Houseman had by an
agreement dated the 27th of April, 1905, agreed to sell and
transfer to Harvey Fisk & Sons, bankers, or their nominee or
nominees, a great many properties, rights, franchises, etc.,
in and along the Susquehanna River, also the capital stock of

several corporations, including two-thirds of the issued capital stock of the Conowingo Land Co. These properties, etc., had been acquired and were held by Messrs. McGaw and Harlow and their associates for the purpose of operating a hydro-electric development. Houseman had no interest in the Conowingo stock, but it belonged to McGaw and Harlow. That agreement was assigned to the Susquehanna Contracting Company, and another agreement was entered into on June 15, 1905, between Messrs. McGaw, Harlow and Houseman, called "vendors," of the first part, and the Susquehanna Contracting Co., called "purchaser," of the second part, for the sale and purchase of the properties, etc., to and by that company, and it is under that agreement the sale was consummated. Paragraph 3 of that agreement is as follows:

"(3) That the conveyances and transfers now being made by vendors or any of them cover and transfer to purchasers all the property interests in or in respect to lands or water rights or corporate stock or interests or other rights useful or valuable in the development of the water power of the Susquehanna River between Columbia and Havre de Grace, or which might be prejudicial thereto, if not transferred, which the vendors or any of them or their associates now own or control."

The appellee contends that by that paragraph the 400 shares of stock and also the evidences of debt were sold by Messrs. McGaw and Harlow to the Susquehanna Contracting Company, but without deeming it necessary to determine whether it so clearly embraced the evidences of debt in question as in terms to include them in the sale, it can not be doubted that Messrs. McGaw and Harlow were in equity and justice under obligation to make known to the purchaser the fact that they held such certificates and claimed to be entitled to be paid for them. The land held by the Conowingo Land Company bordered on the Susquehanna River, and was very valuable for the development scheme, and that was the only property that company owned.

Although the appellee only became the purchaser of the stock on February 24, 1913, the mortgage which was given to secure the bonds held by the bondholders whom appellant represented was executed some time before that, apparently on the 1st day of November, 1906, so far as we can tell from the record; certainly before the suit at law was brought by McGaw against the Conowingo Company, although we do not deem that very material, for even if that company had known of them before it gave the mortgage that would not preclude the bondholders from relief if the certificates of indebtedness are invalid, as we have already said they are. Owing to the number of transactions, the different companies having interests along the Susquehanna River and the abbreviated record, it is somewhat difficult to ascertain accurately the dates and facts of some of the dealings, but apparently the McCalls Ferry Power Company at one time owned these four hundred shares of stock. Mr. Caldwell so testified, and on November 5, 1906, he wrote a letter to the president and directors of that company protesting against the payment of the certificates of indebtedness to McGaw or to Harlow, or to any person claiming to be the owner, holder or transferee of them, and denied that they were lawfully authorized or properly issued. The McCall's Ferry Power Company and the Susquehanna Power Company had considerable litigation, and finally entered into an agreement settling their differences and the latter company became the owner of the 400 shares, although we do not find the precise date on which it became the owner. As will be seen by reference to the case in 124 Maryland, the certificates of indebtedness are payable to bearer, and that is doubtless the reason that the protest included anyone claiming to be the owner, holder or transferee. The rights to properties, etc., along the Susquehanna River were apparently in considerable confusion, and the circumstances in connection with these certificates of indebtedness were such that a court of equity could better pass on them than could be done in a court of law. As we have determined that they were not validly issued, a court of equity is

undoubtedly the proper forum in which to ask to have them cancelled. The bondholders of the Susquehanna Power Company, who purchased the properties, stocks, etc., through the appellee, are entitled to protection and could only obtain ample relief in a court of equity. In addition to that, the bill sought to enjoin the Conowingo Land Company from paying the certificates, and it was made a defendant. As the certificates are payable to bearer, that might be the most effective way of reaching them. Then, as Mr. Caldwell was president when the directors authorized the certificates to be issued, and was present when that was done and is still president, the appellee and those he represented might well have hesitated to permit him to have charge of the defense in a suit at law against the company for those certificates. Although the appellee is owner of the majority of the stock and might have controlled the election of officers when the time for an election arrived, in the meantime the law case might have been tried. For these and other reasons which might be given we are of the opinion that the appellee was entitled to relief in equity.

Explanation of the delay in asking the relief is shown by the fact that although the appellee purchased the properties, etc., for the bondholders in February, 1913, objections were filed to the sale, and were not disposed of until May, 1914, when the sale was ratified and confirmed. Pending the ratification of the sale, the suit reported in 124 Maryland was tried and a verdict rendered on April 2, 1914, upon which judgment was entered on June 13, 1914. An appeal was taken to this Court, and the judgment was reversed on the 13th of January, 1915, and a new trial was awarded. The bill in this case was filed May 25, 1915, when a new trial was about to be begun. So, without further prolonging this opinion by discussing other questions, we will affirm the decree.

*Decree affirmed, the appellant to pay the costs, above and below.*