ARCHWAY MOTORS, INC. ET AL. *v.* EDELSON,
INDIVIDUALLY AND AS CO-ADMINISTRATOR, ET AL.
(Two Appeals in One Record)

[No. 91, October Term, 1952.]

*Decided March 20, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Paul Berman*, with whom were *Sigmund Levin* and *Theodore B. Berman* on the brief, for Archway Motors, Inc., and Raye M. Windt, and Hilda Abramson, Individually and as Trustees.

*J. Martin McDonough* and *Abram C. Joseph*, with whom were *James Piper* and *Daniel C. Joseph* on the brief, for Milton B. Edelson.

*Melvin J. Sykes* for Archie Abramson, Individually and as Co-Administrator, Selma C. Miller, Individually and as Co-Administratrix, and William Labovitz, Co-Administrator.

HENDERSON, J., delivered the opinion of the Court.

This appeal and cross-appeal is from a decree of the Circuit Court No. 2 of Baltimore City dismissing a bill seeking to invalidate three notes issued by Archway and a cross-bill seeking to invalidate the shares of stock issued by that corporation.

When the idea of Archway originated, Abramson and Edelson were brothers-in-law, each married to a sister

of Selig Miller. Abramson had had experience in the automobile business as an executive of the Park Circle Motor Company. In 1946, he heard from a friendly Ford dealer that Ford was planning to establish a new Ford dealership in Baltimore, and, with Miller's encouragement and offer of financial support, sought to obtain it. Miller was a man of independent means. Abramson was not. Edelson, a member of the Maryland bar, was at that time employed as a hotel manager in Florida. He had previously been employed by a mortgage company. About May, 1947, Edelson returned to Baltimore, and he and his wife and the Abramsons occupied duplex apartments in the same house. He became interested in the project. After exploring several proposed sites, they finally acquired and had rezoned a site at Hilton and Edmondson Avenues, which was acceptable to Ford. Abramson, Edelson and Selig Miller each put up $50,000, part of Abramson's advance being supplied by Miller. The corporation was formed in January, 1948, the charter being prepared by Edelson. A construction mortgage of $175,000 was obtained and a new building erected. H. D. Miller, the father of Selig Miller, advanced $100,000 in cash. The company was highly successful from the start. According to the cross-appellants the net profits were, roughly, $22,000 in 1948, $27,000 in 1949, $111,000 in 1950 and $91,000 in 1951. The appellants, disallowing certain payments for services claimed, figure the net profits at much higher figures. It is agreed that the corporation is solvent and has accumulated a large surplus.

Selig Miller died in 1949, leaving his estate to his widow, Selma (now remarried), and three minor children. In 1950, Edelson's wife, Raye Miller Edelson, obtained a divorce from him in Florida and immediately remarried. The hostility between Abramson and Edelson seems to have stemmed from, or was precipitated by, this event. As a part of the property settlement incident to the divorce, Edelson assigned to his wife, now Mrs. Windt, one-half of the 275 shares of Archway stock

which had stood in their joint names. The charter of the corporation, naming Abramson, Edelson and S. Miller as incorporators, authorized 2000 shares of preferred stock of the par value of 100 dollars each and 1000 shares of no-par common. No preferred stock was ever issued. All of the common stock was eventually issued to the three incorporators, or their nominees, in the proportion of $37\frac{1}{2}\%$ each to Abramson and Edelson, and 25% to S. Miller. Corporate promissory notes, dated March 1, 1948 and bearing 8% interest, were issued to Abramson, Edelson and Selig Miller, each in the amount of $50,000, the sums they had previously paid in and deposited in the corporation account. These notes were subsequently surrendered and new notes in the same amounts, dated January 1, 1950 and bearing 4% interest, were issued to the same parties. A corporate note, dated February 25, 1948 and bearing interest at 5% was issued to H. D. Miller.

As a condition to the grant of its franchise, Ford required that a copy of the minutes of the first meeting of stockholders and directors be submitted to it by April 12, 1948. Minutes purporting to be of the first meeting were prepared by Edelson in Florida and mailed to Abramson who presented them to Ford after they had been signed by him and Selig Miller. These minutes were never entered in the corporate minute book. The stockholders' minutes, dated January 5, 1948, authorized the directors to issue stock "in the amounts and to the persons entitled to receive the same", and to borrow money and issue notes therefor. However, the directors' minutes show that no action was taken to exercise the powers granted.

Edelson returned from Florida in June. According to Abramson, Edelson suggested that notes be issued along with the stock, for purposes of tax saving. According to Edelson, the plan had been agreed upon in November, 1947. In any event, Abramson and Selig Miller agreed that the notes be issued. Minutes were prepared and entered in the minute book, purporting to

be the first meeting of stockholders and directors, dated January 15, 1948. The stock holders' minutes contained the same authority to issue stock contained in the set delivered to Ford. The directors' minutes, in addition to general resolutions as to bank accounts, borrowing money and similar matters, contained resolutions directing the officers to issue notes to the three incorporators, each in the amount of $50,000 to be dated March 1, 1948, payable four years from date and bearing interest at 8%, with a statement that "the holders of said notes agree that they will not demand payment of said notes after maturity until such time as the payment of said notes by the corporation would not jeopardize the financial position of the corporation". The minutes also contained a resolution that the officers issue stock on the "basis for loans made to the company in the amount of $50,000 each" by Abramson, Edelson and S. Miller. "In consideration of said loans" there was a direction to issue stock as follows: to Abramson and wife 275 shares, to Abramson 100 shares; to S. Miller 150 shares, to Miller and wife 100 shares, to Edelson and wife 275 shares, to Edelson 50 shares, to Leon Edelson and Florence Edelson Benioff, 25 shares each. The last two designees were the brother and sister of Edelson.

None of the witnesses was able to recall the exact date of this meeting. Apparently it was held in the club basement of Abramson's apartment, and all the incorporators and their wives were present. Abramson says it was in July. At one point he testified that the notes were executed a few days after the stock had been delivered; later he testified that the stock and notes were issued about the same time. The certificates were not printed until July 20, 1948. Edelson says that the notes were issued about a month before the stock, because there was a delay in obtaining the printed certificates. Mrs. Windt says she was present at a meeting where they talked about the division of the stock; she wanted all of Edelson's stock put in their joint names, on the ground that she had signed a note with Edelson to bor-

row $25,000 of the money paid in. Finally, she agreed that 100 shares should be put in the names of Edelson and his brother and sister. She did not hear about the notes until later, but when Edelson told her "that will never be collected * * * because these notes only exist for tax purposes and to absorb certain expenses when the business gets big", she "let it go at that."

Mr. Woolen, a Certified Public Accountant, set up the books and prepared a certified statement on July 22, 1948. This statement showed the $150,000 paid in as "bills payable", and listed the common stock as of no value. He set up the $100,000 loan from H. D. Miller as preferred stock. His jurisdiction was an entry in the minutes authorizing the issuance of a note to H. D. Miller (which was in fact issued) which "would later be transferred into preferred stock as soon as the stock was ready for issuance to Mr. Miller." H. D. Miller apparently never agreed to this. In any event no preferred stock was issued to him, and the entry was corrected in later statements.

When this statement was brought to Ford's attention, there was objection to the notes, primarily because of the high interest rate. In April, 1950 minutes were adopted calling for the cancellation of the notes and substitution of 4% notes, to be dated January 1, 1950, bearing 4% interest, and maturing January 1, 1952. The resolution provided: "repayment of each of said notes at maturity shall be within the discretion of the Board of Directors, who shall have the right of determining whether repayment of all or any part of each of said notes may jeopardize the financial position of the corporation". Ford was apparently satisfied with the reduction in interest. Interest, except for one payment on the earlier notes, was shown as accrued on subsequent statements. Ford did not seriously object when later statements, issued in 1950, showed the $100,000 invested by H. D. Miller as a loan instead of a preferred stock liability, although on the basis of these statements all of the invested capital was in the form of loans. Ford is

not a party to this suit, nor is H. D. Miller, and we express no opinion as to their rights or status. Nor do we express any opinion as to the possible claims of the mortgagee or other creditors, or tax claims by the state or federal authorities. We are only concerned with the respective rights, in a solvent corporation, of the note-holders and stockholders.

The appellants' main contention is that the chancellor erred in failing to find as a fact that the consideration for the issuance of the stock was the cash paid in, and that the notes were issued without consideration. In an effort to avoid the effect of the time-honored rule that findings of fact by the chancellor, especially on a question of credibility, should not be disturbed unless clearly erroneous, the appellants point out that the testimony of the Ford representatives was taken by deposition, and the chancellor did not see these witnesses. They also contend that the chancellor acted under the erroneous impression that because they called Edelson as an adverse witness, in pre-trial depositions, they were bound by his testimony. We are not impressed by these arguments. The testimony of the Ford representatives as to earlier statements made to them as to the proposed corporate set-up is not controlling. Nor did the chancellor base his findings on Edelson's testimony as to the understandings prior to the time when the notes were issued. If we consider only the testimony of Abramson, he admits that at the meeting in July 1948 it was fully agreed that the notes should be issued. The three incorporators, who had paid in the money and were presumably entitled to stock in the proportions agreed upon, then agreed that the notes be executed and the stock issued in consideration of the "loans" and nothing else. The same resolutions that authorized the officers to issue the stock likewise authorized them to issue the notes. The first statement, and all the statements to date, show the notes as liabilities. We see no reason why the. parties, as between themselves, could not make a different agreement before the stock was issued.

As a matter of fact, aside from the hope of tax savings, there was a good reason why Selig Miller might have welcomed the proposal. While it is plausibly argued that since he was to be inactive in the management he was willing that his stock interest, or equity, should be less than the others, the new proposal would put him on equal terms with the others in the return of his capital invested. Woolen testified that Selig Miller asked him in June, 1948 what he thought of the "notes that are being given for the amount that is owed to each individual member", and that he replied that he saw no objection to it.

It is difficult to believe that Mrs. Windt was not fully aware of the proposal from its inception. She was not without business experience, having participated in other business ventures with her own family and with her husband. She admitted that she knew about the notes shortly after the stock was issued. She was evidently satisfied that the issuance of the notes would serve a business purpose, to the benefit both of the corporation and Edelson, in whose income she had a marital interest. It was only after the separation that it became to her financial interest to have the notes invalidated so as to enhance the value of her stock. It is significant that she did not claim any interest in Edelson's note at the time of the property settlement with him.

The appellants contend that the transaction had gone so far, when the first agreement as to the stock division had been reached, that the incorporators could not legally substitute the agreement as to the issuance of both notes and stock. They strongly rely upon the case of *McGaw v. Hoen*, 133 Md. 672, 106 A. 13. In that case promoters conveyed property to a corporation in return for stock. Subsequently, certificates of indebtedness were issued to some of the promoters to the full amount in value of their interests in the property conveyed. The certificates were set aside at the suit of a subsequent purchaser of stock, who also represented certain bondholders. The facts are not entirely clear from the opinion, but we

think the case turned on factors not here present. The stock had been formally issued, as recorded in the minutes, in consideration of the conveyance of the property at its full stated value, not, as in the instant case, on the strength of a resolution reciting that the notes were issued for the cash paid in and the stock for nothing except the "loans". Again, the stockholder suing was not a party to the plan and was entitled to rely upon the corporate records directing the issuance of the stock for the consideration named. There was also a strong intimation that the rights of innocent third parties, or bona fide purchasers without notice, were involved. We think the case is readily distinguishable.

The appellants contend, however, that both in fact and in law the notes were either not intended to be paid, or were so indefinite as to the time of payment as to be illusory. As to the factual situation, Abramson testified at one point that the notes "were just for ourselves and the company would never be obligated to pay them", but later he admitted that the entries in the minutes correctly stated the understanding of the parties, and that the corporation was obligated to pay the notes eventually, but not "unless we were financially able to pay them above all other notes." He also admitted, indeed he could hardly deny, that the notes were carried on the corporate statements, that interest was accrued on them, and that he received at least one payment of interest. He testified he was willing to surrender his note and accept one at a lower interest rate, because this would allow the corporation to get more cars from Ford. He preferred to hold notes rather than stock because this would not only decrease income tax liabilities but also decrease the amounts of corporate bonus or incentive payments by the corporation under the Ford agency plan. Mrs. Windt's testimony that Edelson told her the notes would never be collected, if believed in spite of his denial, is more in the nature of a prophecy than a representation. Both the resolution and the statements issued treated the notes as binding, but deferred, obligations.

As to the legal situation, we think the promise contained in the notes was not illusory. On their face they satisfied all requirements as to definiteness, but it is argued that they are rendered indefinite by the resolutions. We see no difference in substance between the resolutions in regard to the issuance of the 8% notes and the 4% notes. The first resolution deferred the time of payment after maturity "until such time as the payment of said notes by the corporation would not jeopardize the financial position of the corporation". The second provided that repayment at maturity "shall be within the discretion of the Board of Directors, who shall have the right of determining whether repayment of all or any part of each of said notes may jeopardize the financial position of the corporation." We construe the reference to discretion as qualified by the succeeding clause. In other words, the discretion is not absolute but only to be exercised in determining the effect of any payment upon the financial position of the corporation. While the time of payment is not fixed, it is at least ascertainable by an objective standard. We think the notes would be collectible by suit, at least if it could be alleged and shown that the corporation was then able to pay without financial jeopardy.

The case of *Pistel v. Imperial Ins. Co.*, 88 Md. 552, 561, 42 A. 210, 43 L. R. A. 219, is closely in point. There the certificate called for payment "at such times and in such sums as said defendant may feel able to pay the same". It was held that a demurrer was properly sustained because the declaration did not allege that the defendant "felt" able, in other words that it was not only able but knew it was able to pay. But it was clearly stated that if the declaration had so alleged it would have been sufficient under the authorities cited. Many cases are cited in that opinion holding that a promise to pay when able or when convenient is sufficiently definite and not illusory. See also *Blenard v. Blenard*, 185 Md. 548, 557, 45 A. 2d 335; note, 94 A. L. R. 721;

1 *Corbin, Contracts*, Sec. 149, p. 485; 3 *Williston, Contracts* (rev. ed.), Sec. 804.

The cross-appellant contends that the chancellor erred in dismissing the cross-bill attacking the validity of the outstanding stock. We may assume, without deciding, that the stock was not issued in accordance with statutory requirements. It is conceded that no-par stock can be issued for any consideration or for no consideration, if a proper statement is filed, but it is admitted that the resolutions were inadequate and that no stock issuance statement was filed. But the effect of the final agreement of the incorporators was that although their cash advances should bear interest and be ultimately repaid, their *pro rata* shares in corporate profits or upon liquidation should be evidenced by stock in the agreed proportions to be issued to them and their nominees. In the absence of any intervening rights, it would seem that this agreement is enforceable against the corporation in equity. *Cf. R. & F. Products Corp. v. Rosenthal*, 153 Md. 501, 517, 138 A. 665, and *Larkin v. Maclellan*, 140 Md. 570, 588, 118 A. 181. It would be highly inequitable to invalidate the stock and reissue it to the incorporators. Indeed, although one of the prayers of the cross-bill is that Edelson be held entitled to 375 shares of the common stock, we find no such contention in the briefs. There is apparently a considerable value in the stock, due to the earnings of the corporation and appreciation in the value of the site. It would be peculiarly inequitable to deny to Mrs. Windt an interest in the corporation, after the property settlement made by Edelson in which 137½ shares of stock were transferred to her, out of the 275 shares previously held in their joint names. In affirming the dismissal of the cross-bill, we do so without prejudice to the right of any holder of the outstanding certificates of stock to require the corporation to take whatever legal steps may be necessary to comply strictly with the corporation law in order to effectuate the agreement.

*Decree affirmed, appellants and cross-appellant each to pay their own costs.*