MARY HEALEY, Administratrix of MAURICE A. HEA-
LEY *vs.* HENRY LOVERIDGE, and others.

*Agreement—Transfer of Shares of Railroad Stock—Allega-
tion of Fraud.*

The construction of a railroad having been undertaken and pro-
gressed with, and then suspended from lack of means to carry
on the work, and large indebtedness having been incurred, L.
agreed to negotiate certain mortgage bonds and to complete
the road, upon condition that the president, owner of the greater
part of the stock, would transfer to him a specified number of
shares thereof, being a majority of the entire stock of the com-
pany, and upon the further condition that he should have abso-
lute control and management of the affairs of the company. L.
further agreed with the president to negotiate a loan for him in-
dividually on his note secured by the pledge of the balance of
his stock, and that he should be paid a fair compensation
for his services as president of the company, the amount
to be agreed upon, and that all accounts between him and
the company, to which he was largely indebted, should be
audited. The transfer of the specified number of shares was
made as agreed. L. advanced to the president a part of the loan.
He also negotiated the sale of the bonds, and with the money de-
rived therefrom, and with additional means furnished by himself,
the road was completed and fully equipped. L. also tendered to
the president the balance of the loan, but he declined it, being en-
gaged in a negotiation to transfer his stock, and hand over the
control of the company to a rival corporation in violation of his
agreement with L. On learning this, L. had another person
elected president. The accounts between the president and the
company were not adjusted as no sufficient *data* were furnished
for the purpose. On a bill filed by the administratrix of the
president to have his transfer of stock to L. set aside on the
ground that it was obtained by fraud, and without consideration,
it was HELD:

That the agreement by L. was made in good faith and with a pur-
pose to carry out every promise therein made, and his failure to

do so was occasioned by no fault properly chargeable to him, and did not invalidate the transaction.

APPEAL from the Circuit Court for Alleghany County, in Equity.

The case is stated in the opinion of the Court. Henry Loveridge was the only defendant under the original bill, but other parties were made defendants during the progress of the case. The bill of complaint in this case was dismissed by a divided Court, Judge HOFFMAN being of opinion that the complainant had no standing in Court, and Judge SYESTER not concurring in such conclusion.

The cause was argued before ROBINSON, IRVING, BRYAN, FOWLER, and McSHERRY, J.

*David W. Sloan,* and *W. Irvine Cross,* for the appellant.

*W. E. Walsh,* and *William Walsh,* for the appellees.

ROBINSON, J., delivered the opinion of the Court.

This is an Alleghany County case, and the questions are mainly questions of fact, involving charges of bad faith and fraud against high railroad officials, against presidents of coal companies, and against leading members of the bar. The record is a voluminous one, with no less than *five hundred pages of testimony,* a good deal of which is conflicting and contradictory, painfully so, we may add, and it is a difficult matter to get at the truth of some of the transactions closely connected with the questions at issue.

The bill is filed by the administratrix of Maurice A. Healey, to set aside a transfer by him to the defendant Loveridge of 352 shares of stock, being a majority of the entire number of shares of stock of the Pennsylvania

Railroad in Maryland, on the ground that the transfer was obtained by *fraud* and without consideration. To understand properly the object and purposes of this transfer, it is necessary to refer briefly as we can, to some facts about which there is no dispute. The Pennsylvania Railroad in Maryland was chartered in 1876, to run from the City of Cumberland to the Pennsylvania State line, a distance of six miles, and there to connect with the Bedford and Bridgeport Railroad, a part of the Pennsylvania Railroad system. The object in constructing this Road, was to give to the City of Cumberland, the benefits of a competitive road with the Baltimore and Ohio Railroad, then its only outlet. Its estimated cost was $150,000, and this sum was to be raised by the issue and sale of $85,000 first mortgage bonds, and $65,000 Cumberland City bonds, which that city had generously loaned to the company for the completion of the road. There was a capital stock, it is true, of $35,000 divided into 700 shares, all of which was taken, but with the exception of a few hundred dollars for preliminary surveys, no money it seems was paid by the persons to whom the shares were issued. Of these shares, 500 stood in the name of Healey, the active promoter of the road, and its first president, and 100 shares stood in the name of Laing, and 100 shares in the name of Zacharias.

In the early part of 1878, the $65,000 Cumberland City bonds were delivered to Healey, the president of the road, and were sold by him through Col. Schley at 90 cts. of their face value. With the proceeds arising from the sale of these bonds, the work of construction began, under a contract with Messrs. Wingate, Saxton & Co., and progressed satisfactorily, apparently so at least, till about the middle of November of that year, when for reasons satisfactory to themselves, Wingate, Saxton & Co., abandoned their contract. Healey, then attempted to carry on the work, but being unable

to negotiate the $85,000 first mortgage bonds, and being without money or credit, all further work on the road was entirely suspended.   The whole amount expended in grading and construction up to this time, did not, according to the estimate of engineer Gaffney, exceed forty thousand dollars.   The proceeds from the sale of the $65,000 Cumberland City bonds had been deposited in bank by Healey *to his own credit,* and of the sum thus deposited, not less than. $15,000 had been used by him for his own purposes.   All agree, that the prospect of completing the road, was, in the winter of 1879, gloomy and discouraging.   The company was largely indebted to material men and employés, all of whom were clamoring for the payment of their claims, and there was, besides, a wide spread feeling of discontent and indignation on the part of the people of Cumberland, growing out of the suspension of the work, and the reckless management of the affairs of the company, and the general apprehension of the loss of the $65,000 loaned to the company, without the prospect of any corresponding benefit to the city.   No one realized more fully the condition of affairs than Healey himself; and "tormented and worried to death," he says, against the earnest entreaties of both Williams, the counsel of the road, and Haydon, its engineer, he determined to leave Cumberland, his precise whereabouts being unknown.   Before going, however, he executed a power of attorney authorizing Williams and any other person whom he might see proper to associate with him, to negotiate the $85,000 mortgage bonds, on such terms as they might deem best; and to apply the proceeds to the completion of the road. All efforts, however, on the part of Williams, and Col. Schley, associated with him, to negotiate these bonds were unavailing.   "He touched," says Col. Schley, "the money power of the country," but not a dollar could they get.   So, in this emergency, they applied to the

defendant, Loveridge, to aid them in disposing of the bonds. Loveridge was the president of the Maryland Coal Company, which was the owner of large and valuable coal fields in Alleghany County, and resided in New Jersey, with an office in New York City. The company, of which he was the president, and the American Coal Company, were at that time constructing the George's Creek Railroad, as an outlet for their coal, and Loveridge had felt, he admits, a great interest in the completion of the Pennsylvania road in Maryland, because he expected to make a connection of the George's Creek road with it. With this view, he expressed his willingness, not only to negotiate the mortgage bonds, but to complete the road, *upon the condition, however,* that Williams, as attorney for Healey, *would transfer to him* 352 *shares of Healey's stock,* being a majority of the entire stock of the company, and upon the further condition that he was to have the *absolute control and management of the affairs* of the company. Accordingly, on the 2nd of April an agreement was made between Williams, attorney for Healey, and Loveridge, by which 352 shares of stock were transferred to Loveridge, to enable him, says the agreement, *"to retain the absolute control of the Pennsylvania Railroad in Maryland,"* and Loveridge on his part agreed to negotiate the bonds at not less than 80 per cent. of their face value, the proceeds to be applied to the completion of the road; and while retaining the entire control and management of the company, he agrees that Healey shall remain as president.

Now, a great deal was said about the authority of Williams to transfer the 352 shares of Healey's stock, but in view of the subsequent agreement of the 26th of April, between Healey himself and Loveridge, this seems to us to be an immaterial question. Whether, strictly speaking, he had the authority, under the power of attorney, to transfer Healey's stock, all will agree, that

it was made by him in perfect good faith, and for the best interests not only of Healey, but of all parties interested in the road. The stock, he knew, was in fact without any market value. Besides he knew, that Healey was indebted to the company, all the way from $10,000 to $15,000 for money belonging to it which had been used by him for his own purposes. He knew, too, that Healey had given bond to the City of Cumberland, in the sum of $75,000 with sureties, for the completion of the road as a competitive road. *The paramount object of all* parties was to secure the means necessary to complete the road, and having failed to negotiate the bonds himself, he knew that this object could only be accomplished through the assistance of Loveridge. The agreement thus made by him was approved by Schley, and by Haydon, the engineer, and by Beall, the trusted friend of Healey; by the entire board of directors, and would, no doubt, have been approved by Healey himself, if instead of going away he had been on the spot.

No sooner, however, was this agreement made, than Healey returns to Cumberland. The completion of this road, which seemed almost hopeless when he left, was now through the agreement of April 2nd assured. He was not, however, it seems, satisfied with it and denied the authority of Williams to transfer his stock, and said he "would go to New York, and see Loveridge, and get $5000." The result of their interview in New York, led to the execution of the agreement of April 26th, between Healey and Loveridge, by which the former transferred to Loveridge, the 352 shares of stock, and Loveridge on his part agreed to negotiate a loan of $5500 for Healey by the 1st of July, on his note secured by the pledge of his stock as collateral security, and also agreed that Healey should be paid a fair compensation for his services as president of the company, the amount to be agreed upon, and all accounts between him and the

company to be audited by Beall and Loveridge. Immediately upon the execution of this agreement, Loveridge advanced to Healey $500 of the $5500. Thus all obstacles in the way of the completion of the road were removed. Money was advanced by Loveridge at once to pay the indebtedness to the material men and employés; the mortgage bonds were sold by him, none at less than 80 per cent, and some as high as 90 per cent.; and with the money from the sale of the bonds, and additional means furnished by him, the road was in a few months completed and fully equipped as a first class road. The balance of the $5500 loan to Healey, was not, however, it seems, negotiated, nor did Beall and Loveridge ever settle the accounts between Healey and the company, or agree upon the compensation to be allowed him whilst he was president. And the contention of the complainant is, that Loveridge never had any intention of carrying out his part of the agreement, and that it was used by him as a device or trick, for the purpose of getting possession of the 352 shares of Healey's stock, being a majority of the entire number of shares of stock, and thereby securing the control of the company. And in support of this contention the appellant relies:

1st. Upon the failure to negotiate the $5500 loan.

2ndly. The failure to adjust the accounts between Healey and the company, and to agree upon the compensation to be allowed him as president.

3rdly. Upon the election of Schley to succeed him as president.

4th. The sham and pretended sales of the 352 shares by Loveridge to Stewart, and by the latter to Gardner P. Lloyd, President of the American Coal Company.

There is a good deal of testimony, and much of it is contradictory, but after a careful consideration of all of it, we are of opinion that this contention cannot be sustained. We are unable to find any proof to justify us

in saying that the agreement of the 26th of April was made in bad faith, or that Loveridge did not *bona fide* mean to carry out every promise made by him in that agreement, as well as in the agreement of April 2nd. The failure to carry out these promises, was owing to other causes, and not to any fault, properly chargeable to him. It may be proper, in view of the interests involved, that we should state as briefly as we can, the grounds on which this conclusion has been reached.

1st. The failure to negotiate the $5500 loan. And here it must be borne in mind, that this loan was to be made by 1st of July, on Healey's note, with his stock pledged as collateral security; and, further, the number of shares to be pledged was to be determined by Beall and Loveridge. All agree that the note was never presented to Loveridge, nor were the number of shares of stock to be pledged as collateral security ever determined, nor was Loveridge ever requested by Healey or any one else to advance the money. Nor does the proof show any unwillingness on his part to negotiate this loan. On the contrary, the proof is all the other way. Beall himself says, that Loveridge was ready to advance it, and requested him so to inform Healey, and this the witness did. Williams says the same thing. And when Lynn, at Loveridge's request, told Healey that the loan was ready for him at any time, he replied by saying, "he didn't want it." And as late as June 30th, Loveridge telegraphs to Healey, that he was ready to honor a sight draft for the money, accompanied with his note, and 248 shares of stock as collateral. This offer, it was argued, was not made in good faith, because Loveridge knew it was said, that Healey had only 148 shares of stock which he could pledge. But the proof does not support this. In the agreement of the 2nd of April, it was expressly stated *that Healey was the owner of* 600 *shares,* and, if so, he still had 248 shares, after the

transfer of the 352 shares to Loveridge.   So it does not
seem to us, there is a particle of proof to show that the
offer through this telegram, was not a *bona fide* offer.
And in addition to all this, after Healey's death, which
occurred July 8th, Loveridge authorized Williams to
offer the $5000, the balance of the $5500, to Healey's
sister, now complainant, which offer she refused to
accept.

Now, there cannot be, it seems to us, any difficulty in
understanding why this loan was not made, and why
Healey never tendered his note and stock as collateral.
On the very day on which the agreement was made,
Healey spoke to both Beall and Williams of the large
sum of money that could be made by the sale of his
stock and the transfer of the road to the Baltimore
and Ohio Railroad; and it was not till Williams had
denounced such a purpose in the most earnest and
emphatic manner, as a flagrant breach of faith with the
people of Cumberland who had loaned $65,000 to the
company, upon the pledge of Healey himself and the
directors, that the road should be built as a competitive
road, that he promised to abandon the scheme and never
think of it again.   And later in the day, when the agree-
ment between Loveridge and himself was made, by which
he transferred 352 shares of stock to Loveridge, he had
concluded no doubt to stand by his pledge, and to stand
by the agreement.   But he was unable, it seems, to
resist the temptation.   In the early part of June he
tells Clary that he has had "an offer of $25,000 for the
stock of the Pennsylvania railroad in Maryland, and he
had a notion to let it go."

About the same time he tells Lynn he "has a big thing
on hand, that he could make thousands of dollars out of
it" and then spoke of selling out his stock to the Balti-
more and Ohio Railroad instead of to Loveridge.   And
when the witness asked him how he was to get over his

contract with Loveridge, he replied "that was an easy matter," that he had not "accepted the $5000 loan and didn't mean to accept it" but was going to accept the offer from the Baltimore and Ohio.

Ten days after this, he renews the subject with Williams, and solicits his co-operation and begs him to use his influence with Beall, not to come to any settlement with Loveridge under the agreement of the 26th of April. And in the latter part of the month, we find him in conference with the officials of the Baltimore and Ohio, as to the terms and conditions on which he was to transfer his stock and the control of the Pennsylvania Road in Maryland to that company. So, whatever may have been his intention at the time the agreement of the 26th of April was made, and although he may have been willing at that time to have accepted the loan of $5500 on the balance of his stock as collateral security, we are satisfied he had fully made up his mind a few weeks afterwards to sell his stock and hand over the control of the road to the Baltimore and Ohio, provided he could get rid of it, or, to use his own language, "*burst up*," his agreement with Loveridge. And this is why he did not want the $5500 loan negotiated, and why it was not in fact made.

2ndly. The failure to adjust the accounts between Healey and the company.

These accounts were not adjusted, it is true, but it was not from any unwillingness or want of co-operation on the part of Loveridge. Beall, who was to represent Healey in the audit of these accounts, went to Texas immediately after the execution of the agreement of the 26th of April, and did not get back till the last week in May. After his return, in the early part of June, he called on Healey for his account, but it was not ready. As a matter of fact, there were no *data* from which an account could be made. He was the president of a company

expending large sums of money in the construction and grading of the road, and yet no books or accounts were kept of the receipts or disbursements. All its money he deposited in bank to his own credit, and used it not only to defray the expenses of the road, but for his own individual purposes. Instead of an accurate account showing what had been received, and how it had been expended, there was nothing but *loose scraps of paper, memoranda,* and *cheques drawn in Healey's* name, from which a statement of his dealings with the company could be made. We are not surprised, therefore, that both Beall and Loveridge were unable to understand, and found it impossible to adjust his accounts at their first meeting held in the early part of June. Loveridge lived in New Jersey and Beall in Alleghany County; so another meeting was not held till the latter part of the month, and by this time a statement had been made out by Haydon the engineer, but made, as he says, at Healey's dictation. This statement was far from being satisfactory. One item alone of $40,000 was claimed as a credit by Healey without a voucher or proof of any kind to support it. Before passing upon an item of so much importance, Loveridge proposed to see Reed, of Philadelphia, to whom the money was paid; and there was, therefore, but little progress made at this meeting. And thus passed away the month of June, and on the 8th of July, Healey died. As there was no time designated by the agreement of the 26th of April, within which the audit was to be made, Loveridge, after Healey's death, proposed to Beall, that they should go and adjust and settle the accounts, but Beall, being of opinion that his authority to act in the premises had terminated by Healey's death, declined to have any thing more to do with the matter. Now, a great deal was said about Loveridge's having obtained Healey's papers and statements from Beall, upon a pledge by him to return them, and his refusal afterwards to do so. It

may be proper to add, that Loveridge says that Healey delivered these papers to him and he kept them because they belonged in fact to the company. But be this as it may, if there was a breach of faith on the part of Loveridge in this respect, it does not appear that these papers were kept by him for the purpose of preventing or throwing any obstacles in the way of a settlement of Healey's account. On the contrary, they were afterwards delivered by him to Mr. Semmes, the complainant's counsel, for the express purpose of enabling him to make copies, and when this was done, they were returned to Loveridge. It thus appears that the failure to adjust these accounts and to agree upon a compensation to be allowed Healey as president, instead of being the fault of Loveridge, was owing in the first place to the fact that Healey himself was unable to furnish a statement of his account and dealings with the company, from which an audit could have been made; and in the next place, to the refusal of Beall to have anything to do with it after Healey's death. And, besides all this, there was no motive, so far as we can see, on the part of Loveridge, to prevent a settlement of these matters. He knew that Healey was largely indebted to the company, not less than $15,000; and the very liberal allowance of $5000 a year for his services as president of a road *six miles long*, and this is all Healey claimed, would not have more than offset his indebtedness to the company. On the other hand, being utterly insolvent himself, it was a matter of no importance to the company how much his indebtedness really was.

We come, then, to the election of Schley as president in the place of Healey.

We are fully satisfied that the agreement of Loveridge on the 2nd of April, that Healey should remain president, was made in perfect good faith, and that he fully intended to carry out this agreement. Accordingly,

upon the reorganization of the board of directors, May 6th, Healey was, on the motion of Loveridge, elected president.    At that time he did not know, nor had he any reason to suspect, there was any purpose on Healey's part to sell out his stock, and hand over the control of the company to the Baltimore and Ohio Railroad.    He knew that the road had been chartered as a competitive road, and he knew that Healey had obtained a loan of $65,000 from the City of Cumberland on a pledge that it should be built as a competitive road.    But when he found that Healey was negotiating with the officials of that company for the sale of his stock and the transfer of the control of the Pennsylvania Road in Maryland to that company, and had consulted counsel with a view of getting rid of the agreement of the 26th of April, by which he had transfered 352 shares of his stock to Loveridge, the latter was perfectly justifiable in electing some one else to succeed him as president.    So, if it be conceded that Loveridge had fully made up his mind before the annual meeting of the stockholders, July 1st, to elect Schley president, and we can come to no other conclusion from his letter to Schley of June 30th, written only one day before that meeting, although in his testimony he says to the contrary,—yet neither Healey himself nor the complainant, who now represents him, had any ground to complain.    By his own conduct, Healey had forfeited all right to remain president of a company the interest of which he was scheming to betray and to hand over to a rival company.

And this brings us to the last ground relied on in support of this bill, namely, the sham and pretended sales of this stock by Loveridge to Stewart, and by Stewart to Gardner P. Lloyd, President of the American Coal Company.    And here we are obliged to say, and we say it reluctantly, that these pretended sales are far from being creditable to the parties concerned.    Loveridge ·

had negotiated the bonds of the company, had paid off its indebtedness, and had given to the City of Cumberland all the advantages and benefits of a first class road. He had, as we have said, acquired a *bona fide* title to the 352 shares of stock, transferred to him by Healey. If the stock belonged to him, he had the right to sell it open and above board to any who desired to buy it. On the other hand, if he acquired it, and held it in trust for his own company, and the American Coal Company, of which Lloyd was the president, then the object, and only object of these sham sales, was to make *it appear that these companies were bona fide purchasers, without notice* of the facts and circumstances under which the stock was transferred by Healey to Loveridge. We say "*sham sales,*" for with the proof before us, we can come to no other conclusion. Now, how were these sales made? Loveridge says he sold his 352 shares to Stewart, who is represented as a retired merchant, and a man of wealth, and that he sold it on 1st July, (the day on which Schley was elected president to succeed Healey) for the sum of *five dollars*—not five dollars a share, but five dollars for *the entire number of shares.* And then, with circumstantial minuteness, he says that he had agreed to give Schley one-third of whatever profit he might realize from the sale of this stock, and, not having the precise change, *one dollar and sixty-six cents,* he handed over to him *two dollars* as his part of the profits. Now, we do not mean to say that all this did not take place, but what we do mean to say is, that such a sale cannot be treated as a *bona fide sale.* We have seen how desirous Loveridge was to get this stock; that it was necessary to give him the control of the road, and the connection of George's Creek Road with it, and that he made the transfer of this stock as the condition, the indispensable condition, on which he was willing to negotiate the first mortgage bonds, and to build the

road; and now that the road is built, and the connection with the George's Creek Road is made, we are asked to believe, that he makes a *bona fide sale of his stock,* and thereby hands over *the absolute control of the Pennsylvania Road in Maryland to a stranger,* for the *paltry sum of five dollars.* But this is not all, Stewart occupies the same office with Lloyd, the President of the American Coal Company, and Lloyd was present when the stock was sold by Loveridge to Stewart. Some months afterwards, and after this bill was filed, Lloyd makes up his mind to buy this stock, and although Stewart occupied the same office with him, instead of buying the stock himself, he gets a third person to see Stewart, and to this person Stewart sells the 352 shares for *five dollars,* the precise sum he paid Loveridge. So, through Stewart, the stranger and *bona fide purchaser,* we find the stock back into the possession of the American Coal Company. And, on cross-examination, Lloyd admits, that although Stewart knew he was selling the stock to a stranger, yet he knew it was bought in fact for the American Coal Company. But we will not pursue this matter further. It is sufficient to say, that these sales were sham sales, and made for the purpose of putting this stock in the hands of an *apparently bona fide purchaser,* and thereby to defeat Healey and his representatives from getting possession of it, even though they might succeed in setting aside the original transfer to Loveridge. It can hardly be necessary, however, to say, that no Court could be so blind as not to see through such devices and shifts as these; and if the proof had satisfied us that Loveridge had acquired this stock from Healey by fraud, we should have found no difficulty whatever in dealing with the pretensions of Stewart and these coal companies as *bona fide* purchasers without notice.

*Decree affirmed.*

(Decided 19th March, 1890.)