# WILLIAM T. LARKIN ET AL.

## vs.

# NELLIE M. MACLELLAN ET AL., EXECUTORS.

*Corporations—Excessive Issue of Stock—Payment for Services Rendered—Assenting Stockholders—Abandonment of Contract.*

One who had contracted to superintend the construction of certain apartment houses in consideration of his sharing in the resulting profits *held*, on conflicting evidence, not to have abandoned the contract before completion of the buildings, or to have relinquished his interest under the contract.      p. 585

The issue of stock in an apartment house company to one who had agreed with the company to construct certain buildings in consideration of the issue to him of such stock, *held* to have been with the intention of passing title to the stock.  pp. 587, 588

Where the holder of every share of stock in a corporation, and every person interested in the corporation, authorized and participated in the issue of certain stock to an individual for services rendered, that the meeting which authorized such issue was not "duly warned," as required by Code, art. 23, sec. 35, is immaterial.                                              p. 588

That services for which corporate stock was issued had not, at the time of such issue, been fully performed, did not affect the validity of the issue as between the beneficiary thereof and the president of the corporation, such beneficiary having contracted to render the services, and having at that time partially performed them, and such president, the only other person interested, having agreed to the valuation of such services, as shown by his issuance of the stock certificates.            p. 589

Code, art. 23, sec. 36, providing that, when corporate stock is issued for services or property, the books of the corporation shall be so kept as to show the transaction, and requiring the corporate officers to file a certificate with the clerk of court showing the circumstances and details, and providing penalties

for a failure to file such certificate, does not invalidate the issue in case of a non-compliance therewith.                    p. 589

That the number of shares named in a certificate of stock exceeds the total authorized issue of the corporation does not render the certificate void as to the number authorized.    p. 589

The president of a corporation, after issuing, with full knowledge of all the facts, the whole number of shares authorized by the charter, cannot assert, for the purpose of invalidating such issue, that he already held in his possession other shares of the stock.                    p. 590

Where the attorney and agent for a corporation agreed that certain persons should receive a named number of shares of the capital stock for services rendered the corporation, and at an annual stockholders' meeting a resolution was adopted agreeing to such contract, *held* that the corporation, by accepting those services, ratified the contract.                    pp. 590, 591

Where, after the issue of all the authorized stock of a corporation, the holders of such stock assented to and accepted the benefits of a contract made on behalf of the corporation by which a certain number of shares were to be issued in consideration of services rendered, *held* that such stockholders were equally bound with the corporation to carry out the terms of the contract, and to transfer, in proportion to their holdings, the agreed number of shares to the other parties to the contract.                    pp. 590, 591

*Decided March 3rd, 1922.*

Appeals from the Circuit Court of Baltimore City (HEUISLER, J.).

Bill by Nellie N. Maclellan and Stanley Raymond Maclellan, executors of Harry H. Maclellan, deceased, against William T. Larkin, The Lakeview Building Company, John A. Fox, Charles L. Cunningham, Monroe Schmidt, and William H. Williams. From the decree rendered, said defendants take separate appeals. Affirmed in part and reversed in part.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Vernon Cook,* with whom was *William T. Larkin* on the brief, for the appellant William T. Larkin.

*R. E. Kanode,* for the appellant, The Lakeview Building Company.

*Sylvan Hayes Lauchheimer,* for the appellants, John A. Fox, Charles L. Cunningham, Monroe Schmidt, and William H. Williams.

*Herbert Levy* and *John A. Farley,* for the appellees, Nellie Maclellan and Stanley Ray Maclellan, executors.

OFFUTT, J., delivered the opinion of the Court.

William T. Larkin, a lawyer, and Harry H. Maclellan, a builder, some time prior to February 19th, 1915, conceived a plan of purchasing a lot of ground on Lakeview Avenue, in Baltimore City, and improving it by the construction of four apartment houses, and on that day they executed the following agreement:

> "It is hereby mutually agreed by and between Harry H. Maclellan and William T. Larkin that in consideration of the services already performed and such further services as is consistent with their duties in the construction of the four apartment houses to be built on Lakeview Avenue, in Baltimore City, the said parties above mentioned do hereby agree to divide the net profits that may accrue after the payment of all bills, labor, etc., for the construction of said four apartments, as follows:
>
> "The said Harry Maclellan shall receive out of the net profits the sum of $30.00 per week, accounting from the day the construction work is started on the property, and shall continue until the four apart-

ments are completed, and after the payment of this sum of money to the said Harry Maclellan out of the net profits that shall accrue from the sale of rents, shall be divided on the basis of one-half to the said Maclellan and the said Larkin.

"The said Maclellan agrees to superintend the construction of the said four apartments, and the said Larkin agrees to render such legal work from time to time as the said Maclellan shall authorize."

At that time they did not own the lot, and neither of them contemplated furnishing any money to execute the plan, which was to be carried out on credit, but with the aid and advice of Messrs. Charles F. Stein and Herman Scherr, the owners of the land, they secured the land and the funds to carry out their proposed operation in this way:

On May 3rd, 1915, Larkin and Maclellan procured the incorporation of the Lakeview Building Company of Baltimore City (herein called the Lakeview Company), for convenience in carrying out this plan, and on July 12th, 1915, Messrs. Scherr and Stein conveyed the land to that company for $23,000. On the same day Harry H. Maclellan entered into a contract with the Lakeview Building Company to complete the four apartment houses for $50,654.92 in cash and "upon the completion of said houses, and the release of the bond given in this matter, free of all claims and obligations of said bonding company to its obligees, the said contractor shall receive 1,225 shares of the capital stock of the said owner company subject to additions and deductions as hereinbefore provided and that such sum shall be paid by the owner to the contractor and his sub-contractors in current funds, and only upon certificates of the architect * * * The contractor is to be paid only his actual payroll, not to exceed four thousand dollars and to receive no compensation for superintendency, and only to employ such common labor and mechanics as is actually necessary to properly complete this work in manner and form." In order to secure the money

needed to build the houses, the company executed to Messrs.
Stein and Scherr a first mortgage for $78,000 on the property, and they agreed to advance $55,000 in cash to pay the
cost of constructing the houses, and in order to better secure
the payment of the mortgage the South Western Surety Insurance Company executed a "completion" bond to Messrs.
Stein and Scherr for $55,000, guaranteeing the completion
of the houses in conformity with the requirements of the
building contract.

Before the surety company executed that bond, and as conditions essential to its execution, it had demanded that Larkin and Maclellan and their respective wives execute to the
company an indemnity bond, and that all the stock of the
Lakeview Company be issued, endorsed in blank and delivered to it. Accordingly Mr. Larkin and his wife and Mr.
Maclellan and his wife, on July 12th, 1915, executed to the
surety company an indemnity bond for $55,000, in which
they bound themselves to indemnify it against any loss sustained in consequence of its suretyship on the "completion"
bond, and the Lakeview Company at or about the same time
issued to William T. Larkin 1,245 shares of its stock, to
Harry H. Maclellan 1,245 shares and to Herbert N. Maclellan 10 shares, being the entire issue authorized by its charter,
and the certificates for these shares endorsed in blank were
turned over to the surety company. Prior to the issuance of
that stock, certificates had been issued for three shares of the
capital stock of the company to Herbert N. Maclellan, three
shares to John N. Driver, and three shares to William T.
Larkin for organization purposes, and the certificates issued
to Driver and Maclellan for their stock were endorsed in
blank by them and delivered to Larkin, who held them at the
time the 2,500 shares referred to above were issued.

After these several transactions had been completed, the
work of constructing the houses began and proceeded until
some time in the summer of 1916, when it came to a temporary stop. At that time the buildings were nearly com-

pleted, but the fund of $55,000 had been exhausted. The company was indebted to various contractors, who were pressing for payment, the mortgage was due, and several thousand dollars more were needed to complete the construction. At this crisis in the affairs of the enterprise and its promotors, Messrs. Stein and Scherr again came to its rescue and assisted in "refinancing" it, in this way. The original mortgage to Scherr and Stein was released, together with the "completion" and the indemnity bonds. Of the money needed to retire the original mortgage of $78,000, to take care of the most pressing of the company's debts and to complete the buildings, $60,000 was advanced on first mortgage by the Mortgage Guaranty Company, $23,500 by Messrs. Stein and Scherr on a second mortgage, and $4,000 loaned by the German National Bank on a note endorsed by W. Monroe Schmidt, William H. Williams, John A. Fox and Charles H. Cunningham, creditors to whom the Lakeview Company was indebted. The surety company which had executed the "completion" bond, which had been released, executed a second bond guaranteeing the payment of the second mortgage, and the four creditors who had endorsed the Lakeview Company's note also guaranteed the solvency of the surety company. This completed the second financing of the plan of building the four houses. The compensation to be paid to these four creditors is one of the controverted points in the case, but at this point it is sufficient to refer to the contentions of the several parties as to that. They, the four creditors, contend that when they went into the enterprise, the only stock validly issued and outstanding was nine shares, and that for their services they each received one share, for which they made a formal payment of ten dollars, its par value, and that they therefore have four-ninths of all the company's stock. Larkin, on the other hand, contends that he "passed" them each one share of stock in order that there might be more than one man in the company, and not as compensation, and that they do not actually own any stock

in it, but that he owns it all, but that under an agreement made with them they are entitled to receive one hundred shares, while the appellees' contention is that Maclellan and Larkin owned between them equally all the capital stock of the corporation subject to a possible right of the four creditors to receive some part (uncertain in amount) of the stock for their services.

After the execution of the mortgages in July, 1916, building operations were resumed, and the houses finally completed in the latter part of that year, and in the course of time the apartments in them were rented and the rents applied to the liquidation of the company's debts.

On January 22nd, 1920, Maclellan wrote Larkin a letter in which he said in part:

> "I have been trying for the past several weeks to see you, but have failed to get in touch with you. I wanted to talk over the Lakeview matter.
>
> "Do you think you are treating me right and fair regarding our contract of February 19th, 1915?
>
> "This called for payment to me of $30 per week during the construction of the apartments, but which the bonding company refused the payment of this out of the mortgage money. I also paid to Herbert during the time $15 per week as timekeeper, clerk, etc.
>
> "These two items make approximately $2,000 due me, and in addition the $119 paid by me to the Lafayette Mill & Lumber Company on the judgment which you allowed them to get against me by default.
>
> "These items would amount to approximately $2,750 with interest added, and yet I have not yet received the first penny on account.
>
> "While you have had four years' occupancy of an apartment valued at approximately $3,000 and have received commissions, etc., on the collection of rents, etc., of approximately $3,500, or a total of $6,500, besides other fees, etc.
>
> "As our agreement stated I was to be paid the $30 per week before anything else, you should at least

divide up on your commission or endeavor to make the payment to me of amounts due out of the income of the property.

"I requested you some time ago to let me have a statement of the expenses, rentals, etc., as I had a prospect at the time and still have of selling two of the houses for a sufficient amount to clear off all indebtedness on the property, and we could then handle the other two."

This letter was apparently not answered, and on February 9th, 1920, Harry H. Maclellan died. His representatives claimed that, under the terms of the contract of February 19th, 1915, he was entitled to share in the profits arising from the construction of the four houses and to a performance of that contract. The appellants denied this claim on the ground that, when the project was in financial difficulties in 1916, Maclellan wholly abandoned the enterprise, performed no further services, and surrendered any interest he had in it or under the contract, and the controlling question in this case is whether Maclellan did abandon the enterprise before the completion of the houses.

As a result of that controversy the bill of complaint in this case was filed. In it the complainants, after setting out the facts upon which their contention was based, asked in substance for the following relief: (1) that the four creditors and William T. Larkin, defendants, be required to discover all shares of the capital stock of the Lakeview Building Company issued to or acquired by either of them, their relation to the company and the considerations paid for their stock or other interest in it, and to account for all money received from or paid to the corporation by the said defendants; (2) that the Lakeview Company be required to discover all stock issued by it and to account for all rents, profits, etc., received by it; (3) that the contract of February 19th, 1915, be construed and that Larkin be declared

to hold whatever interest he had in the company in trust for
himself and the complainants; (4) that the trust be termi-
nated and Larkin required to assign to the complainants one-
half of any interest he had in the corporation; (5) that the
interest of the parties in the corporation be fixed, and (6 and
7) that the defendants be enjoined from disposing of or en-
cumbering the stock of the corporation whether issued or not.
Answers were filed by the several defendants which, while
differing sharply as to their relative rights *inter sese,* agreed
that Maclellan had no interest whatever in the corporation
or the contract.    Testimony relating to these issues was taken
and, after a hearing and submission, the court decreed: (1)
that the contract of February 19th, 1915, was valid and sub-
sisting; (2) that the Lakeview Company and the defendant
Larkin pay to the complainants $30 a week, accounting from
the date of the commencement of the four houses to their
completion; (3) that the 1,245 shares of the stock of the
Lakeview Company were valid and represented the interest
of the complainants in the corporation; (4) that the corpora-
tion enter the 1,245 shares of stock in the name of the com-
plainants on their books; (5) that the defendants account to
the complainants for all money received and disbursed in
connection with the four houses between February 19th,
1915, and the date of the decree, and that the case be re-
ferred to an auditor to take such account; (6) that the pre-
liminary injunction be continued until the ratification of the
auditor's account to be stated, and (7) that William T. Lar-
kin pay the costs of the proceeding.

· From that decree each of the six defendants appealed sepa-
rately to this Court.

Notwithstanding the number and the variety of interests
involved in this case, and the conflict between them, the con-
trolling and decisive facts and the questions arising from
them are few and, comparatively speaking, plain.   The prin-
cipal and most important question is whether Maclellan ever
surrendered his interest in the contract of February 19, 1915,

or in the apartment houses built under it.   Other material
questions subsidiary to that are:  (1) What is Maclellan's in-
terest in the Lakeview Company; (2) What rights or claims
have the four creditors, Williams, Schmidt, Cunningham
and Fox in or against that company; and (3) Is Maclellan
entitled to receive $30 a week for his work on the buildings
in addition to his share of the profits at the time?   Our first
inquiry is a question of fact and depends upon the weight
to be given to the evidence, documentary and testimonial, re-
lating to it.   The appellants contend that Maclellan aban-
doned the enterprise, and the contract, and they base that
contention upon two alleged facts: (1) that he declared that
he had abandoned it, and (2) that after it got into financial
distress in 1916 he never did any work in it at all.   The ap-
pellees, however, contended that, regardless of the proof as
to what he may have said, he did not abandon the contract,
because he completed all the work, which, in the contract,
he had promised to do, and we will now examine the evidence
bearing on these respective contentions.

Facts may be proven either by direct proof of their exist-
ence or non-existence, or by the admission of the person
sought to be charged with them, and the evidence in this case
contains both kinds of proof.   Before considering the evi-
dence relating to what Maclellan did, it is necessary, to any
fair judgment of its value, to determine what it was that he
agreed to do.   Without referring in detail to the evidence, it
is sufficient to say that it shows that Maclellan was a builder,
and not a lawyer, a promoter, or a financier, and that it was
because he was an experienced builder that Larkin sought
his aid in developing the land on Lakeview Avenue.   Know-
ing his qualifications, Larkin drew the contract of February
19th, 1915.   In that contract the consideration is described
as "services already performed and such further services as
is consistent with their duties in the construction of the four
apartment houses," etc.   At that time the only service ren-
dered by Maclellan had been the preparation of plans and

specifications for the houses, and he had had nothing to do with securing funds to finance the enterprise, or with the manner in which that financing was to be done, nor did he at any time render such service. The thing which the contract specifically required him to do was "to superintend the construction of the said four apartments" and there is nothing to be found in the record to indicate that he agreed to do anything more. It is true that in the "builder's contract" of July 12th, 1915, he agreed to complete the buildings for $50,654.92, but the evidence deprives that fact of its apparent significance by demonstrating that, as between Larkin and Maclellan, those figures were not intended to define Maclellan's undertaking, but were only used to measure the liability of the surety on the "completion bond," since it was conceded by Larkin that he and Maclellan agreed that the cost of constructing the buildings would exceed that sum. In his testimony he said: "As far as the cost of those buildings were concerned, that was done with Mr. Maclellan after all of those estimates were brought in, and Carl Otty and he got together and agreed upon the costs, adding in that ten per cent. for contingencies—in other words the cost of these buildings were to be the amount of $55,000, plus the twenty-five per cent. which was the agreed credit to come from the sub-contractors, and that amount totaled, adding ten per cent. for contingencies, was to be the estimated cost Maclellan was to build these buildings for." So that the services which under the contract Maclellan was required to render in order to entitle him to the benefits of the contract was "to superintend the construction" of the houses, and the question is, did he do that.

The evidence on that issue is conflicting, but the conflict does not relate to Maclellan's services during the entire period occupied in the construction of the buildings, but to only that part of it following October 15th, 1915.

The substance of the complainants' testimony relating to this issue is this: William E. Fox, a paper hanger and a

brother of one of the defendants, saw Maclellan in the build-
ing twice in the month of January, 1916, talking to workmen
employed in its construction.   Thomas J. Rohe, a cement
contractor, testified that he did work (although not continu-
ously) on the buildings between November 15th, 1915, and
February 7th, 1916, and that during that period he took his
orders from Maclellan.   James A. Marrian, Jr., who was,
in 1915 and 1916, in the marble and tile business and sup-
plied the marble and tile work for the building, testified that
the work his firm did was, "as is the case in all operations,
is almost the last part of the work on any building," and
that while engaged in it Maclellan superintended the work
and was the only one they "really depended upon."   John B.
Hopkins, a painter, testified he worked on the houses from
April, 1916, until November of the same year, said that dur-
ing that time he saw Maclellan about the building every
day or two and that he talked with him about repairing cracks
in the porch columns in the week before he left.   William C.
Ward, a carpenter, said that he worked on the buildings
from September or October, 1915, until "six weeks after
Christmas of the year 1915," and that during that period
Maclellan was about the buildings as superintendent of con-
struction "practically every day," and when he left in Feb-
ruary, 1916, one of the apartments was tenanted.   And to
the same effect is the testimony of Grover C. Ward.   Chris-
tolph Schmidt, a carpenter, said that he worked on the build-
ings from about July 1st, 1915, to the middle of October of
the same year, and that he went back in November, 1916,
to do some weather stripping and repair some locks, and that
the last as well as the first work was under Maclellan's super-
intendence.   Charles C. Kraus, who did the "cornice sheet
metal" work and the tinning on the front porches of the
buildings, testified that he was at work there from Novem-
ber, 1915, until February or March, 1916, and that during
that time Maclellan was superintendent of construction of
the buildings.   Clarence Elderkin testified that he saw Mac-

lellan at the building every week in 1916. Nellie Maclellan, the, widow of Harry H. Maclellan, testified that she went to the buildings on one occasion in October, 1916, and found her husband there, and that while she was there a workman employed about the buildings asked him some questions and he went out of the room with the workman. Harry Herbert Maclellan, a son of the decedent, said that, until he left the city in September, 1916, he knew his father was superintendent of construction of the buildings; and Mrs. Gertrude Maclellan Kiehno, a daughter, testified that she accompanied her mother on the occasion when, in October, 1916, she visited the buildings, and that she saw her father giving instruction to a workman employed about the buildings.

In addition to this testimony, George P. Zouck, President of the Consolidated Engineering Company, by which Maclellan was employed, testified that in the latter part of January, 1920, just before his illness, Maclellan had brought him the contract between him and Larkin, and had asked the witness to raise $10,000 to pay off the creditors, and that after that, a few days before Maclellan's death, Larkin came to Zouck's office about the $10,000, and the following conversation ensued: "I told Mr. Larkin I would only be interested in helping Maclellan out; I wanted to know what his interest was there, and he said, 'Well, he has got a fifty per cent. interest there after the creditors are paid off' and I asked him whether any litigation that had taken place by reason of the creditors taking charge of the buildings had wiped out his original contract between Maclellan and himself, and he said, 'No, it has not.' And then I called in—well that was in the presence of Mr. Elderkin * * * and then, thinking that we might help Maclellan out, I called in Mr. Cummins, who is vice-president and general manager of our company, and had Mr. Larkin state before him that the old contract was still in force, and then I said to him, I said, 'Well, Maclellan is very much worried over this thing, let us arrange a conference and see what we can do in the matter.'

And he said, 'Well, I am willing to do that. We ought to do that. But I do not think Harry ought to ask for the full fifty per cent., as I have done all of the work. * * * Harry don't need to worry over it, I am a friend of Harry's, have been a friend of Harry's for a long time, I will be fair with his widow, if anything happens.' " Clarence E. Elderkin, an employee, and Charles A. Cummins, vice-president and general manager of the Consolidated Engineering Company, both testified that they were present at the interview and heard Larkin make substantially the statements to which Mr. Zouck had testified.

In contradiction of this evidence the appellants rely upon the testimony of the following witnesses: John H. Pinning, who had the contract for masonry, excavating and sand for the building, and who testified that he began work at the end of June, 1915, and who was there at intervals for seven or eight months, and that in January, February or March, 1916, he went to see Maclellan about payment for his work and Maclellan told him "he had left the job," that he had "abandoned it"; but the witness further testified that when he was there Maclellan came to the buildings two or three times a week; Ferdinand M. Beamer, president of the company which furnished the dumb-waiters for the buildings, who said he made the contract for them with Larkin, and that he took a check given by Larkin, paying for the work, to Maclellan for his signature, but Maclellan refused to sign it and sent him back to Larkin, and later, when he pressed him for the money, Maclellan told him he would have to get it from Larkin; David Fishack, whose testimony contained nothing material, except possibly a statement that he only saw Maclellan at the first creditors' meeting; Charles H. Wagner of the Heise and Bruns Mill and Lumber Company, which furnished the mill work, testified that "they got into financial trouble toward the end of the job" and had several creditors' meetings, and that while Larkin was present and active at these meetings he did not remember seeing

Maclellan there, and that when he went to Maclellan for money he referred him to Larkin; Frank J. Hill, whose firm installed the electric fixtures and who testified that he made the contract with Larkin and did not see Maclellan about the buildings, but added on cross-examination that he was only on the job three or four times and did not know who was superintending it; Joseph Smith, who was first employed as a night watchman and who later assumed more extensive duties, which he thus describes: "I done cementing, I done janitor work, I was foreman of the men that were on the job, I hired labor and discharged them, I paid them off, I practically done everything that was necessary around there," testified that the buildings were practically finished in June, and that after that he staid on as a janitor and that, from January 27th, 1916, on, Maclellan had nothing to do with the construction of the buildings; Harry E. Karr, a lawyer, attorney for the bonding company, who said that when at the time the company was in distress he was trying to "induce Mr. Maclellan to come in and stand by and try to pull the thing out of the trouble it was in. He simply said, 'I am through and I won't have anything more to do with it' * * * He would not obligate himself in any way as far as the bonding company was concerned. * * * He refused point blank to have anything more to do with it." Charles L. Cunningham, John A. Fox, William H. Williams, three of the "four creditors" and defendants in this suit, testified to their part in securing funds to complete the work and that, in refinancing it, the active work was done by Larkin without any assistance from Maclellan, and Williams further said that when he asked Maclellan to attend the creditors' meetings he had said he was "hands off and couldn't do anything"; William T. Larkin, who said that Maclellan abandoned the work in October, 1915, and did nothing towards the construction of the buildings after that, but that he, Larkin, with the assistance of Joseph Smith, the night watchman and janitor, thereafter superintended the construction of the buildings.

In addition to this evidence there was introduced testimony given by Maclellan in a suit brought by Kaufman & Co., a creditor, for the purpose of setting aside an alleged "fraudulent mortgage" from the Lakeview Company to Larkin and the "four creditors," who are defendants, which contains this statement in reference to a meeting of the creditors who had furnished labor or material for the buildings: "(The Court): Were there any creditors there of the Lakeview Building Company? (The Witness): Not at that time. The creditors of the Lakeview Building Company were constituted after that time, the debts of the Lakeview Building Company, after I failed to complete. Q. The Lakeview Building Company after that time undertook to complete the building, didn't they? A. Yes, sir."

After a careful consideration of all the testimony including that to which we have referred, in our opinion it is sufficient to show that Maclellan fairly discharged the obligation he assumed in the contract of February 19th, 1915, and that he is entitled to receive the benefits which by its terms were conditioned upon such performance, and we fully concur in the conclusion reached by the trial court that it is a valid and subsisting contract. This conclusion rests upon the fact that the testimony of the appellees that Maclellan's services covered the entire period of the contract is reasonably clear and positive and sufficient to establish that fact when taken in connection with Larkin's definite admissions, proved by a clear preponderance of the evidence and made long after the work was done, that Maclellan was entitled to a fifty per cent. interest in the transaction, and that the original contract still remained in force, while the testimony of the appellants, with the exception of Larkin and Smith, as to his work on the buildings is largely negative and unsatisfactory; and we do not feel, for reasons which need not be stated further than to say that it is inherently conflicting and unsatisfactory, that the testimony of Larkin and Smith is sufficient, even when taken in connection with the other evidence

supporting the appellants' contention, to overcome the testimony of the appellees. Nor are we disposed to attribute any conclusive or decisive force to the statements attributed to Maclellan that he had abandoned the work, since in point of fact he did not abandon it, but continued until its completion to render the services in connection with it which in the contract he had promised to perform, and since, long after it had been completed, Larkin admitted that he had not abandoned it, and that he still had his original interest in the contract.

We will next consider the nature and extent of Maclellan's interest in the Lakeview Company. The corporate records, which should present an accurate and complete history of the transactions of the Lakeview Company, are not only so incomplete and confused as to be practically valueless as a source of information, but such information as they do afford is unreliable. It is therefore necessary to go beyond them to ascertain who its stockholders are and what stock they respectively own. The first meeting of the directors of the company was held on June 29th, 1915, when, according to the corporate minutes, subscriptions were received for nine shares of stock from John H. Driver, William T. Larkin and H. Herbert Maclellan, each of whom subscribed to three shares. On the same day these three stockholders held a stockholders' meeting at which William T. Larkin, Harry H. Maclellan and H. Herbert Maclellan were elected directors, and the company was authorized to purchase the ground from Scherr and Stein, to contract with Maclellan for the construction of four apartment houses thereon, to borrow $78,000 on first mortgage, and to secure a "completion" bond from the contractor to the mortgagors. After this meeting, and on the same day, the directors' meeting was resumed, and among the other proceedings this resolution was adopted: "That the entire issue of the stock of this company be delivered to the bonding company who may be surety on the bond of said Maclellan, and that the attorney for this company be employed to prepare such agreement between this company

and the said bonding company as will protect the stock when the said houses shall have been completed."

On July 12th, 1915, the builders' contract between the Lakeview Company and Maclellan was executed, in which the company agreed to deliver to the contractor 1,225 shares of its stock upon the completion of the buildings, and at about the same time the corporation issued certificates for its entire issue of capital stock as follows: 1,245 shares to Harry H. Maclellan, 1,245 shares to William T. Larkin, 10 shares to H. Herbert Maclellan, which was deposited with the bonding company. In the following year Larkin, who had always held the certificates for the original nine shares, delivered one share of the company's stock each to Messrs. Williams, Schmidt, Cunningham and Fox.

In dealing with the question before us the first matter to be disposed of is the status of the 1,245 shares of stock issued to Maclellan, and deposited with the bonding company.

If this were a matter between the corporation or its stockholders and its creditors, the objections urged to the validity of this issue of stock would be unanswerable. It is not, however, such a case, but merely a question as between Larkin and Maclellan, whose rights *inter sese* were fixed by the original contract, as to what interest Maclellan had in the corporation after he had performed his services. The corporation itself was formed for the very purpose of carrying out the contract of February 19th, 1915, and what it did was done in furtherance of that purpose. The several appellants contend that the issue of the 1,245 shares of stock to Maclellan was void, because (1) there was no intention of passing the title to that stock to him; (2) that the requirements of the statute relating to the issue of stock for services had not been complied with, and (3) that this stock was in excess of the authorized issue and therefore void.

Taking up these points in their order, we cannot agree that it was not the intention to pass the title in this stock to Maclellan. Under the building contract signed by the Lakeview

Company through Larkin its president, Maclellan was to re-
ceive 1,225 shares upon the completion of the buildings,
which, when it is considered that that company held the title
to the buildings, is an indication that his share of the profits
to accrue from their sale was to be represented by shares of
the corporation which held them. It is true Larkin contends
that that contract was a mere formality and meant nothing,
but in view of the fact that he admitted that, in his opinion,
the whole arrangement by which the bonding company was to
control the company's stock was invalid and to that extent a
fraud on the company which made the operation possible, the
statements in the written contract are entitled to greater
weight than his oral contradiction, and the fact that the stock
was actually issued and delivered to Maclellan is also signifi-
cant, because, since he endorsed it, a delivery to him must be
presumed. If in fact he had and was to have no interest
in it, there was no reason or necessity for issuing 1,245 shares
to him, as all of the stock could have been issued to Larkin,
or all of it but a few shares; or it could have been issued to
some nominee of the bonding company. But instead of do-
ing that there was issued to Maclellan stock representing
almost precisely the interest in the corporation which under
the contract he had in its property, and to the same effect is
Larkin's admission made in the *Kaufman case* when, in
speaking of these shares, he said: "It is in the hands of Ben-
son & Karr and that stock, 1,225 shares of stock, which was
agreed to be turned over to Mr. Maclellan, is today in the
hands of the Southwestern Surety and Insurance Company,
held by them on account of that bond."

The second objection is that the requirements of the stat-
ute in regard to the issuance of stock for services had not
been complied with. Section 35, art. 23, *Code Pub. Gen.
Laws,* 1911, permitted the issue of stock for services under
the circumstances of this case when authorized by a majority
of all the stock at a meeting duly warned, and since the
holder of every share of stock and every person interested in

the corporation authorized and participated in the issue of this stock, the matter of notice is immaterial. *Tompkins v. Sparry,* 96 Md. 580. The fact that the services for which the stock was issued had not at the time the stock was issued been fully performed does not affect the validity of the issue as between Larkin and Maclellan, since Maclellan had contracted to render them and had at that time partially performed them, and Larkin the only other person interested agreed to the valuation as shown by his issuance of the certificates. *Healey v. Loveridge,* 72 Md. 220; *Tompkins v. Sperry,* 96 Md. 580. Section 36 of art. 23, *Code Pub. Gen. Laws,* contains certain provisions directing that the books of the corporation issuing such stock shall be so kept as to show the transaction, and requiring the officers of the corporation to file a certificate showing the circumstances and details of the transaction with the clerk of the circuit court of any county or the Superior Court of Baltimore City, and providing penalties for a failure to file such certificate. These provisions cannot affect the validity of the issue, but are designed to secure, through punitive measures against the officers of the corporation, the public record of a transaction which had already been consummated, and not to punish the stockholder, upon whom the statute imposes no duty in respect to recording or certifying the facts, by destroying the validity of his stock. *Weber v. Fickey,* 52 Md. 516.

The next objection is that the stock issued to Maclellan was in excess of the issue authorized by the company's charter and therefore void. It is of course perfectly true that a corporation can issue only the number of shares of stock authorized by its charter, and shares issued after the number allowed by the charter have been issued are void, but it does not follow that because the whole number of shares named in a certificate exceeds the authorized issue, while less than the whole number will be within it, that the whole issue will be void. The reason why shares issued in excess of the authorized number are void is obvious, since when the

charter limits the issue of stock to a definite number of shares it divides its capital into just so many parts, and any increase in the number of shares would affect the value of each part. But that reason does not require that where an issue of ninety shares is authorized that a certificate for ninety-one will be wholly void, since the reason for the rule would be gratified by holding that it was only void as to the excess. *Byers* v. *Rollins,* 13 Col. 22. But it cannot be assumed that there was an over issue of stock in this case. At the time the twenty-five hundred shares of stock were issued to the two Maclellans and Larkin, nine shares had been issued which were then in Larkin's possession, and which he claimed as his own. Unless he intended to perpetrate a deliberate fraud upon the bonding company, he must either have included those shares in the shares he issued to himself, or he must have treated them as surrendered to the corporation and cancelled, and after he, with full knowledge of all the facts as the president of the company, issued the whole number of shares authorized by the company's charter, he will not now be permitted to say that he held in his possession other shares which invalidated his act.

In our opinion therefore the issue of 1,245 shares of stock to Maclellan was valid.

The next question to be considered is the interest of the "four creditors" in the corporation. We cannot agree with their contention that they have acquired four-ninths of the company's assets through their ownership of four of the twenty-five hundred shares of its stock, since, for reasons already stated, when they acquired their stock all the stock, twenty-five hundred shares, of the corporation, had been validly issued. But they are entitled, nevertheless, to be compensated for their services to the corporation. Larkin testified that for those services it was agreed they were each to receive one hundred shares of the capital stock of the corporation and, at an annual stockholders' meeting of the company, a resolution was adopted agreeing to that contract which was

made by Larkin, the attorney and agent for the corporation, and, waiving any objection to the regularity of that meeting, the corporation by accepting those services ratified the contract. Since, however, at the time the contract was made, all the stock of the company had been issued to Larkin and the two Maclellans, and as they were represented by Larkin and as they assented to and accepted the benefits of the contract with knowledge of the facts, they are equally bound, with the corporation to carry out the terms of the contract, to transfer in proportion to their holdings to each of the "four creditors," Williams, Schmidt, Cunningham and Fox, one hundred shares of the stock of the Lakeview Company at the request of the four creditors. The enforcement of that contract is not now before us under the pleadings in this case and we will not for that reason finally dispose of this question at this time, but upon the remand of the proceedings in this case, should such a request be made within a reasonable time, an order may be passed directing such transfer of such stock to the four creditors.

This brings us to the right of Maclellan to receive thirty dollars per week from the rents and profits from the four houses, accounting from the commencement of the construction of them until their completion. We cannot agree with the learned trial court that William T. Larkin and the Lakeview Company should be required to make that payment at this time. In the present state of the record it does not appear clearly what proportion if any of the total profits from the four houses are "net profits," or that there are net profits sufficient to make such payment, but the case should be referred to an auditor under the fifth clause of the decree, in order that that information may be obtained and a decree entered acccordingly.

So much of the decree appealed from as recognized the validity of the agreement of February 19th, 1915, and which relates to the status of the 1,245 shares of the capital stock of the corporation issued to Harry H. Maclellan, provides

for an accounting; continues the preliminary injunction and fixes the costs, as set forth in the first, third, fourth, fifth, sixth and seventh clauses thereof, is affirmed, and so much thereof as directs the payment at this time of thirty dollars a week to the appellees, accounting from the commencement to the conclusion of the construction of the four houses, is reversed, and the cause remanded, in order that an account may be taken of the rents, issues and profits of the four apartment houses, and a final decree entered in accordance with the views expressed in this opinion.

> *Affirmed in part and reversed in part, and cause remanded for further proceedings in accordance with this opinion, each side to pay one-half the costs.*